**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-CR-0008-CVE** |
| | ) | |
| **LESLIE SCHOBE THOMPSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Now before the Court is Defendant Leslie Schobe Thompson's Motion to Suppress (Dkt. # 37).  Defendant Leslie Schobe Thompson ("Thompson") moves to suppress "all evidence obtained from the unconstitutional search of his room at 4686 North Main Street, Tulsa, Oklahoma, which occurred on December 9, 2006, as well as all material derived from that search, including incriminating statements made by Mr. Thompson, both at the residence and later at a police station." Dkt. # 37, at 1.  The United States argues that the warrantless entry into defendant's bedroom was constitutional because (1) they obtained valid consent; and (2) exigent circumstances existed. Further, the United States argues that the warrantless search and seizure of items from defendant's bedroom was lawful.  The Court held a suppression hearing on February 23, 2007.  For the reasons set forth below, the Court finds that the motion to suppress should be denied.

**I.**

On December 9, 2006, the Tulsa Police Department received a telephone call from a female at 9:18 a.m.  The woman said that the person who had robbed BancFirst the previous day, known as "Grasshopper", was at her mother's house, located at 4686 North Main Street.  The woman explained that she recognized the subject's picture on television and noted that he wore dark glasses all the time.  Dkt. # 37, Ex. A.[1]

Officer Keenan Meadors and Officer Bowman were dispatched to 4686 North Main Street "to pick up the suspect of the Bank First [sic] robbery." Dkt. # 37, Ex. B (Meadors Police Narrative).  The dispatch informed Officer Meadors that Grasshopper was a black male who was approximately 5 feet, 6 inches tall and weighed 185 pounds.  The dispatch did not mention that there was a medical emergency at the residence, that "Grasshopper" was getting ready to flee, that he was likely destroying evidence, or that he was likely to be on the premises for only a short period of time.  Officer Meadors requested additional officers.  Corporal Blair arrived at the home with a picture of the suspect.  Officers Vann, Crisp, Moore, Adlridge and Currie took positions around the house. Id.

---

[1]    Defendant refers to this female caller as an anonymous tipster.  The Court finds that, although the female caller's name is unknown, she is not an anonymous tipster.  The female caller identified herself as the daughter of the woman who lived at 4686 North Main Street.  Further, she appears to have provided the police with her phone number (or at least the police had a record of her phone number) because they were able to contact her after the initial call.  While the police did not know the female caller's name, they had sufficient information to determine her identity.  In this way, the caller was not anonymous and could be held responsible if her allegations turned out to be fabricated.  See Florida v. J.L., 529 U.S. 266, 270 (2000) ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to fabricated, . . . an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.").

Corporal Blair, Officer Bowman, and Officer Meadors approached the front door. Id. They did not have an arrest warrant for defendant or a warrant to search the residence. Officer Meadors knocked on the door, five series of four knocks spaced about 20 seconds apart. At the suppression hearing, Officer Meadors testified that he became suspicious because it took several minutes for anyone to open the door. As he and the other officers were waiting outside, he heard people moving around inside the house.

A woman eventually opened the door, and Officer Meadors inquired as to her name. She responded that her name was Diane Snell ("Snell"). He then asked Snell if she was the owner of the residence, and she responded in the affirmative. When Officer Meadors asked her if he and the other officers could enter the house, she admitted them. Officer Meadors asked Snell if anyone else was in the house, and she indicated that her boyfriend was in her bedroom. Officer Meadors told Snell that they were looking for a man called "Grasshopper" because he was an armed robbery suspect. He asked Snell whether Grasshopper was at the residence. She responded that, while Grasshopper had been to the house, she was not sure if he was there at that time. Officer Meadors then asked Snell if she would grant them permission to search the house. He testified that she granted them permission to conduct a search and did not place any limits on the search.

Officer Meadors entered the southwest bedroom and saw a person, who did not match the picture of the suspect, on the couch. Dkt. # 37, Ex.  That person was identified as Brian Thompson and was handcuffed and sent to the living room. Id.  Other officers found Gerald Hawkins in the southeast bedroom, handcuffed Hawkins, and escorted him to the living room.

Officer Meadors then proceeded to the northwest bedroom. While he was outside of the northwest bedroom, Snell told him that, if Grasshopper was in the house, he would likely be in that

3

bedroom. Officer Meadors testified that Snell never mentioned anything to him regarding Grasshopper's relationship to the bedroom (i.e. whether he was a boarder). According to Officer Meadors, he did not know whether Grasshopper was renting that bedroom. The door to the northwest bedroom was closed. Officer Meadors opened the door and proceeded into the bedroom. No one was visible in the room, so Officer Meadors opened the closed closet door. He saw a "brown foot uncovered." Dkt. # 37, Ex. B. At gunpoint, he ordered the person out of the closet. The man identified himself as Leslie Thompson. According to Officer Meadors, Thompson was an "exact match" to the BancFirst picture brought by Corporal Blair. Officer Meadors placed Thompson under arrest, secured him in handcuffs, checked him for weapons, and escorted him to the dining area. Officer Meadors testified that, upon seeing the other persons in handcuffs, Thompson told him that no one else was involved.

Corporal Anders arrived on the scene and obtained a search waiver from Snell at 10:10 a.m. Dkt. # 37, Ex. D. Officer Meadors asked Thompson to sign a search waiver. He read the search waiver to Thompson in its entirety because Thompson said that he did not have his glasses. After reading the search waiver to Thompson, Thompson produced his glasses and signed the waiver at 10:16 a.m. Dkt. # 37, Ex. E. At 10:36 a.m., Thompson signed the Tulsa Police Rights Waiver form, which informed him of his Miranda rights. Dkt. # 37, Ex. F.

After Thompson signed the search waiver, Officer Meadors exited the residence and used the computer in his police car. He found that Thompson was wanted in Kansas on a probation violation for rape and kidnaping and that Kansas "confirmed they will extradite, hold without bond." Dkt. # 37, Ex. B.

Crime Scene Investigator Detective Robinson processed Thompson's room for evidence. Dkt. # 37, Ex. C. He recovered a loaded black pistol, dark sunglasses, a black sweatshirt, and cash from Thompson's wallet. Dkt. # 37, Ex. E. Officer Richert took photographs of these objects. Dkt. # 37, Ex. H.

Detective St. Clair arrived at the scene after Thompson had been handcuffed. Detective St. Clair testified that he asked Snell about her relationship with Thompson. Snell told Detective St. Clair for the first time that Thomson had been living at her home for the past month and had paid her $100 rent for the back bedroom. Dkt. # 37, Ex. C. At the suppression hearing, Detective St. Clair testified that he spoke with Snell on February 22, 2007. During that conversation, Snell stated that the northwest bedroom did not lock and that the room was not set aside for Thompson's exclusive use. She told Detective St. Clair that she and others were free to go in and out of the bedroom.

Detective St. Clair instructed Officer Meadors to transport Thompson to the Detective Division for questioning. Dkt. # 37, Ex. B. Detective St. Clair and FBI Agent Wall met with Thompson at the robbery office. Dkt. # 37, Ex. C. Detective St. Clair again read Thompson his <u>Miranda</u> rights from the previously signed Tulsa Police Rights Waiver form. <u>Id.</u> According to Detective St. Clair's statement, Thompson agreed to make a statement and he confessed to being the perpetrator of the BancFirst robbery.

## II.

The Fourth Amendment imposes strict limits on when law enforcement officers may enter a home[2] without a warrant.[3] See United States v. McCullough, 457 F.3d 1150, 1163 (10th Cir. 2006) ("'It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" (quoting Payton v. New York, 445 U.S. 573, 586 (1980)).  A principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on government agents who enter the home for purposes of search or arrest.  Welch v. Wisconsin, 466 U.S. 740, 748 (1984); United States v. Davis, 290 F.3d 1239, 1242 (10th Cir. 2002).

Although warrantless entry into the home is presumptively unreasonable, officers may enter a home without a warrant if (1) they have consent, see Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); United States v. Abdenbi, 361 F.3d 1282 (10th Cir. 2004) (holding that the Fourth Amendment's general prohibition against warrantless entry into a person's home to make arrest or

---

[2]    It seems quite clear that, although Thomson did not own the residence located at 4686 North Main Street, the search of that residence should be treated as his "home" for Fourth Amendment purposes. See Minnesota v. Carter, 525 U.S. 83, 95 (Scalia, J. concurring) ("Of course this is not to say that the Fourth Amendment protects only the Lord of the Manor who holds his estate in fee simple.  People call a house "their" home when legal title is in the bank, when they rent it, and even then they merely occupy it rent free– *so long as they actually live there*.  That this is the criterion of the people's protection against government intrusion into 'their' houses is established by the leading American case of *Oystead v. Shed*, 13 Mass. 520 (1816), which held it a trespass for the sheriff to break into a dwelling to capture a boarder who lived there.") (emphasis in original).  Here, assuming for the purposes of the motion to suppress that defendant was a "boarder" in Snell's house, the Fourth Amendment applies.

[3]    There appears to have been a Kansas warrant for defendant's arrest at the time the officers entered the residence.  However, Officer Meadors did not learn of this warrant until after they had entered the house and conducted the search.  Thus, the entry and search should be treated as if they were warrantless.

to search for specific objects does not apply in situations in which voluntary consent has been obtained), or (2) if they have probable cause and there are exigent circumstances. See Payton, 445 U.S. at 590; Kirk v. Louisiana, 536 U.S. 636, 639 (2002). Thus, the Court must determine first whether the officers entered defendant's bedroom and arrested him without a warrant by obtaining consent from Snell, the owner and another occupier of the home. If there was no valid consent, then the Court must determine whether the officers had probable cause and whether there were exigent circumstances to justify the warrantless entry to defendant's bedroom.

### A.

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possess common authority over the premises." Rodriguez, 497 U.S. at 181. The consent of a third party to a search of common premises is effectual if the third party has either actual authority or the apparent authority to consent to a search. See Rodriguez, 497 U.S. at 188; United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004); United States v. Gutierrez-Hermosillo, 142 F.3d 1225, 1230 (10th Cir. 1998).

While counsel for defendant relies on the seminal case of Payton throughout his brief, the Court notes that this case is readily distinguishable from Payton. In the consolidated cases decided in Payton, the officers entered the defendants' homes without the consent of any occupant. 445 U.S.

at 583.  Thus, although the <u>Payton</u> Court used broad language at times[4], it is clear that consent as well as exigent circumstances constitutes a justifiable reason for a warrantless entry into the home.

### 1.      Actual Authority

Whether a third party has the actual authority to grant entry to law enforcement officers is determined by the test articulated in <u>United States v. Matlock</u>, 415 U.S. 164 (1974).  <u>See</u> <u>Gutierrez-Hermosillo</u>, 142 F.3d at 1230.  The test is whether the third party has "mutual use of the property[,] . . . generally ha[s] joint access or control for most purposes[,] . . . and [whether] the others have assumed the risk that one of their number might permit the common area to be searched."  <u>Matlock</u>, 415 U.S. at 171.  In interpreting the <u>Matlock</u> test, the Tenth Circuit has held that "a third party has authority to consent to a search of property if that third party has <u>either</u> (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." <u>United States v. Rith</u>, 164 F.3d 1323, 1329 (10th Cir. 1999) (emphasis added).  It is the government's burden to show that the third party had the actual authority to consent to the search of the home.  <u>See</u> <u>Rodriguez</u>, 497 U.S. at 181; <u>Rith</u>, 164 F.3d at 1328.

---

[4]      The Court stated, "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590.  This language, read alone, might suggest that exigent circumstances is the only justification for a warrantless entrance.  Indeed, counsel for defense states that "the **only** exception [to the basic principle that warrantless searches and seizures inside a home are presumptively unreasonable] is the "exigent circumstances" exception."  Dkt. # 37, at 4 (emphasis in original).

Generally, a landlord/lessor cannot effectively consent to a police search of an area leased exclusively to a tenant.[5]  See United States v. Owens, 782 F.2d 146, 150 (10th Cir. 1986).  Here, however, defendant did not retain exclusive control over the entire residence located at 4686 North Main Street because both Snell and defendant resided at the residence.  Indeed, while counsel for defendant focuses on the fact that Snell was defendant's landlord, this was not a landlord/tenant situation where the landlord lived off the rented premises.[6]  Given that Snell resided in the residence, there is no question that Snell had the actual authority to consent to officer's warrantless entry and search of the common areas.  The main question is whether she had the authority to consent to the search of defendant's bedroom.

In applying the Matlock test to this case, it appears that Snell had the actual authority to consent to the search of the northwest bedroom based on her "mutual use of the property by virtue

---

[5]     Even though Snell was the owner of the residence, she later volunteered that defendant paid $100 rent for the northwest bedroom.  Although the Court received no evidence to prove that defendant actually paid for the room, the Court will assume, for purposes of this motion, that he was a boarder.

[6]     There is clear authority that a landlord cannot consent to the search of leased premises based solely on their status as a landlord.  According to the Supreme Court, "the Court has held that a search by police officers of a house occupied by a tenant invaded the tenant's constitutional right, even though the search was authorized by the owner of the house, who presumably had not only apparent but actual authority to enter the house for some purposes, such as to 'view waste.'  Chapman v. United States, 365 U.S. 610 . . . .  The Court pointed out that the officers' purpose in entering was not to view waste but to search for distilling equipment, and concluded that to uphold such a search without a warrant would leave tenants' homes secure only in the discretion of their landlords."  Stoner v. California, 376 U.S. 483, 489-90 (1964).  For the reasons stated above, this case is not analogous to Chapman or Stoner because Snell  lived at the residence in question.

of joint access."[7]   Although defendant paid rent for the northwest bedroom, defendant did not have "exclusive" control over that room.  Detective St. Clair testified that Snell informed him that she and others were free to go in and out of the northwest bedroom.[8]  Defendant assumed the risk that Snell would permit the search of his rented room.  Thus, the Court finds that Snell had the actual authority to consent to the entry of defendant's room.

## 2.    Apparent Authority

Even if Snell did not have actual authority to consent to the officers' entry into defendant's rented room, the entry was constitutional if the officers reasonably believed that Snell had the apparent authority to give consent.  In Rodriguez, the Supreme Court held that, when law enforcement officers reasonably (though erroneously) believe that a person has the authority to grant consent to a search of premises, then warrantless entry of the premises is valid.  497 U.S. at 186. Here, even if Snell did not have actual authority over Thompson's bedroom, the warrantless entry into defendant's bedroom was valid if the officers reasonably believed that Snell had authority to consent to their entry of defendant's bedroom.

---

[7]    Whereas "mutual use of property by virtue of joint access" is a fact-intensive inquiry, "control for most purposes" is a "normative inquiry dependant upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  Rith, 164 F.3d at 1330. "Relationships which give rise to a presumption of control of property include parent-child relationships and husband-wife relationships."  Id.  Here, the relationship between Snell and defendant was landlord/tenant.  It is unlikely that such a relationship creates a presumption of control.  Cf. United States v. Duran, 957 F.2d 499, 505 (7th Cir. 1992) ("Two friends inhabiting expect to maintain exclusive access to their respective bedrooms without explicitly making this expectation clear to one another.") (cited in Rith); United States v. Heisman, 503 F.2d 1284, 1287 (8th Cir. 1974) (although defendant's room did not have a door or look, co-tenant did not have authority to consent to a search of defendant's private areas) (cited in Rith).

[8]    The Court found no reason to question the credibility of Detective St. Clair.

Here, defendant argues that Snell's consent was not valid because she told the police that Thompson was a boarder.  In other words, since the police knew that defendant was a boarder, they could not reasonably have relied upon Snell's consent to enter his bedroom.  Counsel for defense focuses on the statement by Detective St. Clair: "Ms. Snell advised me that Leslie ha[d] been living at her home for the past month and has paid her $100 rent for the back bedroom."  Dkt. # 37, Ex. C.  However, the testimony of Officer Meadors and Detective St. Clair at the suppression hearing and the exhibits make clear that Detective St. Clair did not arrive until after Officer Meadors had entered defendant's bedroom.  Defendant was already in handcuffs by the time Detective St. Clair arrived at the scene.  Officer Meadors testified that Snell never gave any indication that defendant was renting the northwest room or otherwise identified his relationship to that room.  In fact, Snell told Officer Meadors that she the owner of the house.  From the perspective of a reasonable officer, absent statements to the contrary, Snell's statement indicated that she had the authority to consent to the search of the entire residence.  Further, the call from Snell's daughter did not mention that defendant was a boarder.  She merely stated that Grasshopper was at her mother's house.  Thus, there is no reason to believe that the officers knew or reasonably should have known that defendant was a boarder and that Snell could not have consented to entry into his bedroom.

"[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent."  Kimoana, 383 F.3d at 1222.  "The burden [of proving effectiveness of consent] cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry."  Id. (quoting United States v. Whitfield, 939 F.2d 1071, 1075 (D.C. Cir. 1991)).  "Warrantless entry is unlawful without further inquiry if 'circumstances make it unclear whether the property about to be searched is subject to mutual use

by the person giving consent.'" Id.  Counsel for defendant argues that, even prior to Detective St.

Clair's arrival, Officer Meadors and the other officers at the residence had reason to question Snell's

authority to consent to the search of the northwest bedroom.  According to defendant, because

Officer Meadors knew that different people stayed in different bedrooms,[9] he should have known

that defendant might be a boarder with exclusive access to the northwest bedroom.  The Court finds

this argument unpersuasive.  Just because there are several people present in a house and might

inhabit different bedrooms does not necessarily indicate a landlord/tenant relationship.  Because

there is no evidence that, prior to their entry of the northwest bedroom and arrest of defendant, the

officers faced an ambiguous situation, the Court finds that Snell had the apparent authority to

consent to the search of that room.

**3.      Voluntariness of Snell's Consent**

Any consent granted by a third party must be voluntary.  See Gutierrez-Hermosillo, 142 F.3d

at 1230; United States v. Irbe, 11 F.3d 1553, 1557 (10th Cir. 1993).  "When a prosecutor seeks to

rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent

was, in fact, freely and voluntarily given."  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).

"Voluntariness is a finding of fact, to be determined under the totality of the circumstances."  United

States v. Guzman, 864 F.2d 1512, 1521 (10th Cir. 1988).  Consent cannot be "coerced, by explicit

or implicit means, by implicit threat or covert force."  Bustamonte, 412 U.S. at 228.  "Consent is

voluntary if there is no indication of either 'force of intimidation.'"  Kimoana, 383 F.3d at 1225

(quoting United States v. Dewitt, 946 F.2d 1497, 1500 (10th Cir. 1991)).

---

[9]      For example, Officer Meadors knew that Snell had a boyfriend who was in Snell's bedroom.

Counsel for defense argues that Snell's consent was not voluntary because, when she opened the door and saw multiple officers, she could not reasonably have denied their request to enter the house.  If the Court were to adopt defendant's position, then in effect, law enforcement officers could never obtain consent to enter a house without a warrant.  This is contrary to Supreme Court and Tenth Circuit precedent.  As noted above, the law is clear that warrantless entry to the home is permissible if the officers obtain consent.  Further, the fact that Snell was confronted by several officers does not render her consent involuntary.  Neither the Supreme Court nor the Tenth Circuit has enunciated a rule whereby consent is per se involuntary if one is confronted by a certain number of police officers.  See, e.g., United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir. 1994) (finding that arrestee's Spanish-speaking coresident did not voluntarily consent to the search of the house was not supported by evidence, notwithstanding coresident's subjective attitude toward authority and the fact that five officers were present at the time coresident consented).  Here, there is no evidence that the officers used any threats or intimidation to obtain entry to the residence.  Thus, the Court finds that Snell's consent was voluntary.

**4.      Scope of Consent**

The next inquiry is whether the police officers exceeded the scope of Snell's consent.  The Court has already addressed the issue of whether Snell had the authority to consent to the search of defendant's bedroom.  However, a question may arise as to whether the officers exceeded the scope of Snell's consent by opening the closed closet doors in the northwest bedroom.

Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances.  United States v. Pena, 920 F.2d 509, 514 (10th Cir. 1990).  The Court should apply an objective reasonableness test to measure the scope of a

person's consent. <u>Kimoana</u>, 383 F.3d at 1223.  "The scope of a search is generally defined by its expressed object."  <u>Id.</u> (quoting <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991)).  <u>Id.</u>  Here, the expressed object of the search was defendant.  The officers specifically asked Snell if "Grasshopper" was in the house.  Further, Snell did not give any indication that her consent to search the residence was limited in any way.  Therefore, the officers did not exceed the scope of Snell's consent to look for defendant by opening the closet because it is reasonable that a person would hide a closet.  <u>See</u> <u>Kimoana</u>, 383 F.3d at 1223 ("Consent to search for specific items includes consent to search for those areas or containers that might reasonably contain those items.").

### B.

In the alternative to its argument that Snell validly consented to the search of defendant's bedroom, the United States argues that the officers constitutionally entered defendant's bedroom because exigent circumstances existed.  As noted above, in addition to consent, law enforcement officers can validly enter a home without a warrant if they have probable cause and there are exigent circumstances.  <u>See</u> <u>Brigham City v. Stuart</u>, 126 S. Ct. 1943 (2006); <u>Georgia v. Randolph</u>, 126 S. Ct. 1515 (2006); <u>Payton</u>, 445 U.S. at 590; <u>Kirk v. Louisiana</u>, 536 U.S. 636, 639 (2002).  Exigent circumstances that may justify warrantless entry into the home include hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to police officers or other people inside or outside the home.  <u>Minnesota v. Olson</u>, 495 U.S. 91, 100 (1990); <u>United States v. Thompson</u>, 372 F.3d 1173, 1177 (10th Cir. 2004).  However, the exigent circumstances exception to the warrant requirement is narrow and must be jealously and carefully drawn. <u>Roska ex rel. Roska v. Peterson</u>, 328 F.3d 1230, 1240 (10th Cir. 2003). There is no absolute test for the presence of exigent circumstances because such a determination ultimately depends upon

the unique facts of each controversy.  United States v. Rhiger, 315 F.3d 1283, 1288 (10th Cir. 2003);

United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993).  The government bears a "heavy

burden" to show exigency.  United States v. Flowers, 336 F.3d 1222, 1230 (10th Cir. 2003);  United

States v. Scroger, 98 F.3d 1256, 1259 (10th Cir. 1996).  In assessing whether the burden of proving

exigency justifying warrantless search is met, the Court evaluates the circumstances as they would

have appeared to prudent, cautious, and trained officers.  United States v. Anderson, 154 F.3d 1225,

1233 (10th Cir. 1998).

        Though its brief is unclear, the United States indicated at the suppression hearing that the

exigent circumstances did not exist until the police officers had entered 4686 North Main Street.

At that time, given that they had heard "scuffling" before Snell opened the door, and given the police

presence in the residence, they contend that exigent circumstances existed because of fear that the

armed suspect might flee, evidence might be destroyed, and concern that their and others' safety

may be at risk.  For the reasons set forth below, the Court finds that exigent circumstances did not

exist.

        The United States relies, in part, on the case of Warden v. Hayden, 387 U.S. 294 (1967).

Though that case also involved an armed robbery suspect, the Court finds the case readily

distinguishable.  There, an armed robber had entered the business premises of a company, took

money, and ran.  Cab drivers followed the man to a house and were able to give a brief description

of him to their dispatcher.  The dispatch relayed the information to the police, who arrived at the

house within less than five minutes.  The police entered the house and arrested the suspect.  The

Supreme Court found that the "Fourth Amendment does not require police officers to delay in the

course of an investigation if to do so would gravely endanger their lives or the lives of others."

Hayden, 387 U.S. at 298-99.  It noted that "speed here was essential, and only a thorough search of the house for person and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape."  Id. at 299.  Here, while the officers also received information regarding a potential armed robbery suspect who carried a gun, the temporal distance between the robbery and the call from Snell's daughter make this case substantially different.  In Hayden, the police responded immediately to the bank robbery and a fleeing suspect.  Here, even after Snell's daughter informed authorities that Grasshopper was at her mother's house, there was no indication that Grasshopper was fleeing, was likely to be on the premises for only a short period of time, was about to destroy evidence, or was posing an immediate risk to the other occupants of the house.  Unlike the armed robbery suspect in Hayden, for all the law enforcement officers knew, Grasshopper may have been at 4686 North Main Street since the robbery the previous day or he may have left the residence long before the officers arrived.  Thus, unlike Hayden, speed was not critical; the officers could have procured an arrest and search warrant and had officers stake the house in the time it took to prepare the warrants.  Indeed, the United States appears to have conceded at the suppression hearing that no exigency existed prior to the officers' entry of the house.

The United States argues, however, that the exigency arose when officers lawfully entered 4686 North Main Street.  However, the government produced no evidence at the suppression hearing that, other than the "scuffling" prior to Snell opening the door, the officers had any other indication that evidence was being destroyed or that persons, including themselves, were in danger.  The officers' mere belief that evidence was in the house is insufficient to create exigent circumstances. See United States v. Anderson, 981 F.2d 1560, 1567-68 (10th Cir. 1992) (holding that police

16

officer's belief that contraband is present in the home cannot, without more, serve as a basis for warrantless entry and search based on exigent circumstances).  Further, while the officers had received information that Grasshopper may have had a gun and was on the premises (or at least had been on the premises), once they arrived, there was no evidence that anyone was "seriously injured or threatened with such injury."  Stuart, 126 S. Ct. at 1947.  There was no "objectively reasonable basis to believe that there was an immediate need to protect the lives or safety of themselves or others."  United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006).  Absent more evidence of an imminent destruction of evidence or immediate threat to safety beyond the "scuffling", the government's heavy burden of proving exigency is not met.

The Court also rejects the United States' argument that exigency existed because the armed suspect might flee.  As with the argument concerning destruction of evidence and safety threat, the United States produced little evidence, other than the "scuffling", that there was risk of flight.  In other Tenth Circuit cases concerning exigency due to risk of the suspect's escape, the officers had substantially more information that the suspect in question was on the verge of fleeing or escaping. See, e.g., Wicks, 995 F.3d at 970-71 (finding exigency where defendant's increasing nervousness and his suspicions about the government informant, coupled with information regarding his "cycle" gave officers reason to believe that defendant was planning to flee); United States v. Acquino, 836 F.2d 1268, 1273 (10th Cir. 1988) (presence of individuals who gave evasive answers to police questions and release of those persons created possibility that news of arrest would reach others in drug connection, along with belief that supplier was growing suspicious, constituted exigent circumstances).  Here, the police officers' concern that the suspect would escape is further diminished by the fact that other police officers had surrounded the house.  As the Minnesota

17

Supreme Court found, and the Supreme Court affirmed, in <u>Minnesota v. Olson</u>, there were no exigent circumstances because "[i]f [the suspect] came out of the house he would have been promptly apprehended."  496 U.S. at 101.  Finally, the Court notes that every time police officers are present and wish to catch a suspect in a crime, they may be worried about escape.  The Court is not willing to expand the exigent circumstances exception to permit warrantless searches whenever the police are lawfully present based on hypothetical concerns of escape.  Such an expansion of the exigent circumstances exception would come dangerously close to permitting law enforcement officers to create exigencies to justify warrantless intrusions.  <u>See</u> <u>Flowers</u>, 336 F.2d at 1230; <u>Anderson</u>, 154 F.3d at 1234.

While the Court finds that exigent circumstances did not exist to justify the warrantless entry into defendant's bedroom, this finding does not change the Court's decision to deny the motion to suppress because, as noted above, the Court finds that the police officers obtained consent to search the bedroom.

### III.

A search of a person's property is generally unreasonable and violative of the Fourth Amendment when made without a search warrant unless the government can show a valid consent to the search by the defendant.  Thus, the main issue is whether defendant's consent, in the form of the search waiver, was voluntary and freely given.  Voluntariness is a highly fact-insensitive inquiry and must be determined by the totality of the circumstances.

Before conducting a search of the house, the officers obtained a search waiver from both Snell and Thompson.  Dkt. # 37, Ex. D, E.  The search waiver stated that they had been informed of their constitutional right not to have a search made of the premises without a search warrant being

issued.  Id.  It authorized the officers to conduct a search of property in their possession and to take such property for the criminal investigation.  The waiver further stated that "written permission is being given by me to the above named officers voluntarily and without threats or promises of any kind."  Id.

Defendant signed the waiver after he had been placed under arrest.  The Court "views with caution and misgivings any search based upon a consent given after arrest, and under circumstances indicating intimidation or coercion of any kind.  The consent must be freely given, and [the Court] will indulge in 'every reasonable presumption against waiver.'"  Wion v. United States, 325 F.2d 420,423 (10th Cir. 1963); see also United States v. Shields, 573 F.2d 18, 23 (10th Cir. 1978).  "Even so, the [C]ourt must look to all the facts and circumstances in determining whether consent to search is freely given by one under arrest."  Shields, 573 F.2d at 23.  The mere fact that defendant was under arrest does not mean that his consent to search the northwest bedroom was involuntary.  See Shields, 573 F.2d at 23 (holding that, even though defendant was under arrest when he signed written search waiver, the consent was voluntary).  Here, defendant was read and signed the plainly drafted search waiver, which expressly noted that he could refuse to consent to the search.  See, e.g., United States v. Davis, 197 F.3d 1048, 1053 (10th Cir. 1999) (holding that, where arrestee signed a plainly drafted search waiver form advising him of his right to refuse, and where there was nothing in the record to indicate that he did not know what he was doing, the district court did not err in finding that the consent was voluntary).  There is no evidence that the officers threatened or intimidated defendant into signing the form.  Thus, the Court finds that defendant gave his consent to search the room freely, intelligently, and unequivocally.

19

Counsel for defendant argues that the evidence from the search should be excluded because his waiver occurred "after he had been unconstitutionally rousted (barefoot) from the closet." Dkt. # 37, at 9. His argument, therefore, rests on the argument that waiver was still "tainted" by the illegal entry into defendant's room. Once the initial premise concerning the unconstitutionality of the entry is rejected, defendant's argument is without merit. See Davis, 197 F.3d at 1052 (because defendant's arrest was supported by probable cause, it did not "taint" his consent to search his bedroom).

## IV.

Counsel for defendant likewise argues that defendant's incriminating statements should be excluded because the self-incrimination waiver was also tainted by the illegal entry of the apartment. Again, this argument lacks merit because the Court concludes that the entry was legal.

The Court notes that defendant made some incriminating statements before being read his Miranda rights. Defendant did not sign the Notification of Rights waiver until 10:35 a.m., after he had signed the search waiver. Officer Meadors testified that he made an incriminating statement that he was the only one involved in the robberies prior to signing that waiver. Miranda warnings are only required for custodial interrogation. United States v. Patane, 542 U.S. 630, 639. Here, defendant was in custody when he was arrested and handcuffed. See Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (noting that Miranda protections apply when one's freedom of movement is curtailed in a manner consistent with a formal arrest). However, Miranda does not bar the admission of volunteered statements that are not in response to police questioning. Miranda v. Arizona, 384 U.S. 436, 478 (1966). Defendant volunteered the statements in question. There is no indication that

defendant made these statements after prompting by the officers; thus, those statements are not subject to exclusion.

## V.

In summary, the Court finds that the officers' warrantless entry into 4686 North Main Street and the northwest bedroom thereof was constitutional because they obtained consent – both actual and apparent – from Snell.  Further, the search of the northwest bedroom was valid because the officer obtained a voluntary search waiver from Snell and defendant prior to the search.  Since the entry to defendant's bedroom was lawful, the evidence obtained during the search of the bedroom and any incriminating statements that defendant made are admissible.  Therefore, the Court denies defendant's motion to suppress.

**IT IS THEREFORE ORDERED** that Defendant Leslie Schobe Thompson's Motion to Suppress (Dkt. # 37) is hereby **denied**.

**DATED** this 26th day of February, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT